**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

Fillingim Farms, Inc., on behalf of itself and all others similarly situated,

Plaintiff,

v.

Nutrien Ltd; Nutrien Ag Solutions; CF Industries Holdings, Inc.; Koch Inc., f/k/a Koch Industries, LLC; Koch Ag & Energy Solutions, LLC; Koch Fertilizer Wever, LLC; Koch Fertilizer, LLC; Koch Agronomic Services, LLC; Yara International ASA; Yara North America, Inc.; and The Mosaic Co.,

Defendants.

Civil Case No. 1:26-cv-04214

**Jury Trial Demanded**

## CLASS ACTION COMPLAINT

Plaintiff Fillingim Farms, Inc. ("Fillingim Farms"), on behalf of itself and all others similarly situated, for its Complaint against defendants Nutrien Ltd; Nutrien Ag Solutions; CF Industries Holdings, Inc.; Koch Inc., f/k/a Koch Industries, LLC; Koch Ag & Energy Solutions, LLC; Koch Fertilizer Wever, LLC; Koch Fertilizer, LLC; Koch Agronomic Services, LLC; Yara International ASA; Yara North America, Inc.; and The Mosaic Co. (collectively "Defendants"), states:

## NATURE OF THE ACTION

1. This is an antitrust price-fixing case against the largest producers and sellers of nitrogen, phosphate and potassium (potash) fertilizers (collectively, "NPK Fertilizers") arising out of Defendants' conspiracy to fix the prices of NPK Fertilizers sold in the United States and its territories from January 1, 2021 to the present.

2. This lawsuit seeks both monetary and injunctive relief arising from Defendants' unlawful

and ongoing agreement to fix the prices for NPK Fertilizers.

3. Defendants are direct competitors and among the largest producers and sellers of NPK Fertilizers in the United States.

4. Among the victims of the conspiracy are direct purchasers of NPK Fertilizers from the Defendants, including agricultural retailers, fertilizer mixers, members of farming associations, farm and planting partnerships/companies, and individual farmers/growers.

5. To implement their price-fixing conspiracy, beginning at least as early as January 1, 2021, the exact date being unknown to Plaintiff at this time, Defendants conspired to artificially inflate the price of NPK Fertilizers.

6. Defendants' unlawful agreement caused direct purchasers of NPK Fertilizers in the United States and its territories, including Plaintiff and the Class, to pay supra-competitive prices for NPK Fertilizers sold by Defendants in the United States and its territories from the period beginning no later than January 1, 2021 and running through the date on which the Class is certified (the "Class Period"), in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

**JURISDICTION AND VENUE**

7. Plaintiff brings this case under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover damages, costs of suit, and reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other relief available for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

8. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26). The Court has jurisdiction over Plaintiff's claim for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

9. The Court also has original jurisdiction over this lawsuit pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6), because Plaintiff is a citizen of a state different from

that of one or more of the Defendants; the Class has more than 100 members; the aggregate amount in controversy exceeds five million dollars, exclusive of attorney's fees, interest and costs; and Class Members reside across the United States.

10. The Court has personal jurisdiction over the Defendants based on Fed. R. Civ. P. 4(d) and Section 12 of the Clayton Act (15 U.S.C. § 22), which authorizes nationwide service of process and confers personal jurisdiction over a defendant who has sufficient minimum contacts with the United States as a whole. When Congress has enacted such a nationwide service of process statute, personal jurisdiction exists whenever the defendant has sufficient minimum contacts with the United States to satisfy the Fifth Amendment's due process requirements. Exercising personal jurisdiction over a defendant is proper under the Fifth Amendment Due Process Clause when, as here, the defendant and the conduct at issue bear a meaningful relationship to the United States. Defendants have a meaningful relationship with the United States through their or their subsidiaries' operation in the country and their sale of NPK Fertilizers throughout the United States. The United States and its courts, including this Court, have a clear interest in adjudicating anticompetitive conduct occurring in the United States that affects United States commerce and United States businesses and consumers. Defendants are sophisticated and substantial organizations with United States facilities or subsidiaries and have operations in this country, making it fair for them to litigate in this District.

11. Alternatively, the Court has personal jurisdiction over Defendants because they purposefully directed their business activity toward this jurisdiction and had substantial contacts with this jurisdiction. Defendants purposefully placed price-fixed NPK Fertilizer into the stream of commerce throughout the United States, including in this District. Defendants purposefully availed themselves of the laws and protections of this state. Plaintiff's claim for relief arises from and relates to illegal acts committed by Defendants within this jurisdiction because Defendants imposed unlawful overcharges for NPK Fertilizers and caused antitrust injury within this jurisdiction. Defendants' antitrust conspiracy was

and is directed at, and had and has the intended effect of causing injury to, persons residing in, located in, or doing business in the United States, including in this District. Defendants sell their products in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

12. Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26) and 28 U.S.C. § 1391(b), (c), and (d) because one or more of the Defendants reside, transact business, is found or has agents in this District. For example, CF Industries Holdings, Inc. operates its corporate headquarters in this District.

13. Defendants' conduct alleged herein occurred within the flow of interstate commerce, including in this District, and was intended to and did have a direct and substantial effect upon such commerce. During the Class Period, Defendants manufactured and sold NPK fertilizers as part of a continuous flow of interstate commerce. Their activities included producing and selling these fertilizers within this District and employing sales and other personnel here. Defendants' conduct had, and continues to have, a direct, substantial, and reasonably foreseeable impact on interstate commerce, including commerce within this District.

14. This District is a convenient forum for both the parties and the witnesses involved in this case.

## PARTIES

### I. Plaintiff

15. Plaintiff Fillingim Farms, Inc. ("Fillingim Farms" or "Plaintiff") is a citizen of Alabama as it is an Alabama corporation with its principal place of business in Jack, Alabama. Plaintiff Fillingim Farms purchased NPK Fertilizer directly from one or more of the Defendants at artificially inflated prices during the Class Period. Fillingim Farms suffered an antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

**II. Defendants**

**Nutrien Defendants**

16. Defendant Nutrien Ltd. is a corporation organized under the laws of Saskatchewan, Canada, with its principal executive offices in Saskatoon, Saskatchewan. Nutrien is the resulting entity from the 2018 merger of Agrium and Potash Corporation of Saskatchewan.[1]

17. Defendant Nutrien Ag Solutions is a Delaware corporation with its principal executive offices in Loveland, Colorado, and it is a wholly owned subsidiary of Nutrien Ltd. Alternately or in addition, Nutrien Ag Solutions is Nutrien Ltd's global retail division. Nutrien Ag Solutions' LinkedIn page describes itself as "[o]perated by Nutrien Retail, Nutrien Ag Solutions is a unit of Nutrien Ltd., the world's largest agricultural inputs company."[2] On Nutrien Ag Solution's LinkedIn page the company claims to have over 10,000 employees.

18. This Complaint refers to Nutrien Ltd. and Nutrien Ag Solutions collectively as "Nutrien."

**CF Industries**

19. Defendant CF Industries Holdings, Inc. is a Delaware corporation with its principal executive offices in Northbrook, Illinois. CF Industries is a publicly traded company, listed on the New York Stock Exchange (NYSE: CF). This Complaint refers to CF Industries Holdings, Inc. as "CF Industries."

**Koch Defendants**

20. Koch Inc. is a Kansas corporation with its headquarters in Wichita, Kansas. On August 29, 2024, Koch Industries, LLC, announced it would thereafter go by the name of Koch, Inc.,[3] consistent with

---

[1] *Agrium*, Linkedin, https://www.linkedin.com/company/agrium (accessed April 14, 2026).
[2] *Nutrien Ag Solutions*, Linkedin, https://www.linkedin.com/company/nutrien-ag-solutions (accessed April 14, 2026).
[3] *See* Press Release, *Koch Ag & Energy Solutions Completes Acquisition of Wever, Iowa, Fertilizer Plant*, PR Newswire (Aug. 29, 2024), https://www.prnewswire.com/news-releases/koch-ag--energy-solutions-completes-acquisition-of-wever-iowa-fertilizer-plant-302234228.html (accessed April 14, 2026); *see also Koch Inc: Overview*, Global Data, https://www.globaldata.com/company-profile/koch-industries-inc/ (accessed April 14, 2026) ("Koch Inc. (Koch) previously Koch Industries, LLC is a diversified multinational corporation engaged in a wide range of industrial activities.").

the Kansas Secretary of State's website records indicating a merger and "conversion" in July 2024. Therefore, Koch, Inc., is the surviving entity and successor of its merger with Koch Industries, LLC.

21. Koch Ag & Energy Solutions, LLC, is a Delaware limited liability company with its principal executive offices in Wichita, Kansas. Koch Ag & Energy Solutions, LLC, is an indirect wholly owned subsidiary of Koch Industries, Inc. Koch Ag & Energy Solutions, LLC offers fertilizer, agronomic, and other services to its customers.[4] A 2024 press release from this entity indicated it had invested $2 billion in North American fertilizer production facilities, and was spending another $3.6 billion to acquire its new plant in Wever, Iowa.[5]

22. Koch Fertilizer Wever, LLC, is a Delaware limited liability company with its principal executive office in Wichita, Kansas. On August 29, 2024, Koch Ag & Energy Solutions announced it acquired the Wever, Iowa fertilizer plant from OCI Global for $3.6 billion.[6] Therefore, Koch Fertilizer Wever, LLC is a wholly-owned subsidiary of Koch Ag & Energy Solutions, LLC.

23. Defendant Koch Fertilizer, LLC is a Kansas Domestic Limited Liability Company with its principal executive offices in Wichita, Kansas. Koch Fertilizer, LLC, "and its subsidiaries are collectively one of the world's largest producers and marketers of fertilizers" with the ability "to manufacture, market and distribute more than 13 million metric tons of fertilizer products annually." Koch Fertilizer owns or has interests in fertilizer plants in the United States and Canada, has a global distribution system including state-of-the-art terminals in the United States, and sells fertilizers including ammonia, urea, UAN, phosphate, potash, and sulfur-based products.[7] Koch Fertilizer, LLC, and its affiliates "own or have interests in nitrogen fertilizer plants in the United States" and other locations.[8] Koch Fertilizer, LLC is a

---

[4] *Koch Ag & Energy Solutions*, Crunchbase, https://www.crunchbase.com/organization/koch-ag-energy-solutions (accessed April 14, 2026).
[5] Press Release, *Koch Ag & Energy Solutions Completes Acquisition of Wever, Iowa, Fertilizer Plant*, *supra*.
[6] *Id.*
[7] *Koch Fertilizer, LLC*, Crunchbase, https://www.crunchbase.com/organization/koch-fertilizer-llc (accessed April 14, 2026).
[8] Press Release, *Koch Ag & Energy Solutions Completes Acquisition of Wever, Iowa, Fertilizer Plant*, *supra*.

wholly-owned subsidiary of Koch Ag & Energy Solutions, LLC.[9]

24. Defendant Koch Agronomic Services, LLC is a Delaware limited liability company with its principal executive offices in Wichita, Kansas. "Koch Agronomic Services, LLC and other subsidiaries of Koch Fertilizer, LLC have become one of the world's largest networks for manufacturing and marketing value-added fertilizer products.[10] Therefore, Koch Agronomic Services, LLC, is a wholly owned subsidiary of Koch Fertilizer, LLC.

25. This complaint refers to Koch Industries, LLC; Koch, Inc.; Koch Ag & Energy Solutions, LLC; Koch Fertilizer Wever, LLC; Koch Fertilizer, LLC; and Koch Agronomic Services, LLC collectively as "Koch Defendants."

**Yara Defendants**

26. Defendant Yara International ASA is incorporated in The Kingdom of Norway with its principal executive offices in Oslo, Norway. Yara International ASA is publicly traded, listed on the Oslo Stock Exchange (YAR:OL), and has registered American Depositary Receipts in the United States. Yara International ASA produces and markets fertilizers and related solutions and collected $13.9 billion in 2024 revenue.

27. Defendant Yara North America Inc. is a privately held Delaware corporation with its principal executive offices in Tampa, Florida. Yara North America, Inc. "manufactures fertilizers and agricultural chemicals and offers animal feeds, soluble fertilizers, and farm supplies."[11] A 2010 press release stated Yara International ASA had agreed to acquire Terra Industries, Inc. for approximately $4.1

[9] *See id.* ("Koch Ag & Energy Solutions, LLC and its subsidiaries, including Koch Fertilizer, Koch Agronomic Services, Koch Energy Services and Koch Methanol, are global providers of value-added solutions for the agriculture, energy, and chemical markets.").
[10] *Koch Agronomic Services, LLC*, Crunchbase, https://www.crunchbase.com/organization/koch-agronomic-services (accessed April 14, 2026).
[11] *Yara North America*, Crunchbase, https://www.crunchbase.com/organization/yara-north-america (accessed April 14, 2026).

billion and convert Terra Industries into its wholly-owned subsidiary named Yara North America.[12] Zoominfo has estimated Yara North America's income at $72.5 million per year and reported its website is www.yara.us.[13]

28. This Complaint refers to Yara International ASA and Yara North America Inc. collectively as "Yara."

**Mosaic Defendants**

29. Defendant The Mosaic Co. (NYSE: MOS) is a Delaware corporation with its principal offices in Tampa, Florida. The Mosaic Co. is a vertically integrated business engaged in all phases of crop nutrition including producing and selling phosphate and potash.[14] This Complaint refers to The Mosaic Co. as "Mosaic."

**Agents and Co-Conspirators**

30. The Defendants' anticompetitive and unlawful acts alleged in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives while they actively engaged in the management, direction, or control of Defendants' businesses or affairs. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

31. Each corporate Defendant's agents operated under the authority and apparent authority of its respective principals.

32. Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

[12] Press Release, Terra Industries Inc. *Terra Industries to be Acquired by Yara International for US$41.10 per Share in Cash*, Securities and Exchange Commission Archives, https://www.sec.gov/Archives/edgar/data/722079/000095012310012769/c56322exv99w1.htm (accessed April 14, 2026).

[13] *Yara North America*, Zoominfo, https://www.zoominfo.com/c/yara-north-america-inc/1123348659 (accessed April 14, 2026).

[14] *Mosaic*, Crunchbase, https://www.crunchbase.com/organization/the-mosaic-company (accessed April 14, 2026).

33. Various persons and/or firms not named as Defendants herein participated as co-conspirators in the violations alleged herein and likely performed acts and made statements in furtherance thereof.

34. Each Defendant acted as the principal or agent of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

35. When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Defendants' conspiracy involved Defendants' reliance that other corporate families would act consistently with their agents' statements about prices and production. Because Defendants operate and market themselves as corporate families, individual participants in the conspiratorial acts did not often know or identify the corporate affiliations of themselves or their counterparts, nor did they recognize the technical distinction between the entities within a corporate family. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to raise and maintain supra-competitive prices of NPK Fertilizers.

36. Canpotex Limited is a private joint venture owned by Nutrien Ltd. and Mosaic Canada Corp. Nutrition, LP (a wholly-owned subsidiary of Mosaic). Canpotex Limited maintains its principal executive offices in Saskatoon, Saskatchewan, Canada. In a 2020 letter to the United States Securities and Exchange Commission, Mosaic's Controller Lydia A. Burke explained that Canpotex Limited is a Saskatchewan export association owned by Mosaic and Nutrien. Each owner's relative economic interest in the joint venture "dictates the relative volumes of potash product" they sell to Canpotex. These ownership interests can be adjusted as the owners "add peaking capacities."

37. Canpotex's board of directors includes representatives of both Mosaic and Nutrien.[15] Mosaic has explained that it does not consolidate Canpotex's accounting with its own accounting, but rather records its equity investment "using the equity method of accounting."[16] Canpotex ships potash into the United States by rail and operates shipping terminals in Portland, Oregon and Thunder Bay, Ontario. This Complaint refers to Canpotex Limited as "Canpotex."

38. In a previous price-fixing case, the Seventh Circuit Court of Appeals noted the plaintiffs' claim that Canpotex facilitated that price-fixing arrangement by providing Mosaic, Agrium, and PCS with "access to one another's sensitive production and pricing information." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 850 (7th Cir. 2012) (*en banc*), *cert. dismissed*, 570 U.S. 935 (2013).

## FACTUAL ALLEGATIONS

### I. NPK Fertilizers

39. Modern agriculture depends heavily on three essential nutrients that plants must have in large quantities: nitrogen, phosphorus, and potassium. These nutrients are supplied to crops through what farmer commonly call nitrogen, phosphate, and potash fertilizers—individually and in combination referred to as NPK Fertilizers (named after the chemical symbols for the nutrients they contain). Together they form the basis of most fertilizer programs around the world. Each plays a different role in plant growth and requires different raw inputs.

40. NPK Fertilizers are applied both individually and in blended formulations depending on crop and soil requirements. Farmers use single-nutrient products when a specific nutrient is needed, but other times blend fertilizers containing nitrogen, phosphorus, and potassium in set proportions. These blends are typically labeled with three numbers indicating the percentage of each nutrient in the product.

---

[15] Letter, Lydia A. Burke, Mosaic, to Securities and Exchange Commission regarding Mosaic Form 10-K for Fiscal Year Ended December 31, 2019 (Aug. 17, 2020), https://www.sec.gov/Archives/edgar/data/1285785/000124378620000111/filename1.htm (accessed April 14, 2026)

[16] *Id.*

***Nitrogen Fertilizers***

41. Nitrogen fertilizers are widely used in agriculture because nitrogen is the nutrient plants require in the greatest quantity. Nitrogen is a key component of chlorophyll, the molecule that enables photosynthesis, and it is also necessary to form proteins and other biological compounds involved in plant growth. Nitrogen supports the development of leaves and stems and is associated with faster vegetative growth and higher crop yields.

42. Most nitrogen fertilizers originate from industrial ammonia production using the Haber-Bosch process. In this process, nitrogen gas from the air is combined with hydrogen, typically derived from natural gas, under conditions of high temperature and pressure in the presence of a catalyst to produce ammonia. This ammonia serves as the principal intermediate used to manufacture a variety of nitrogen fertilizer products.

43. Common nitrogen fertilizers include Urea, Ammonium nitrate, Ammonium sulfate, and Urea ammonium nitrate solution. These fertilizers vary in nitrogen concentration and form but each supplies nitrogen that plants absorb as nitrate or ammonium ions. They are commonly sold as small, typically round granules or "prills."

***Phosphate Fertilizers***

44. Phosphate fertilizers supply phosphorus, an essential nutrient required for energy transfer within plant cells, including through molecules such as ATP, and contribute to early plant development, root formation, and the production of flowers and seeds. Adequate phosphorus availability is associated with strong root systems and successful crop establishment.

45. Phosphate fertilizers are produced from phosphate rock, a naturally occurring mineral resource mined from geological deposits. After mining, the rock is processed chemically, typically by treatment with acids, to convert the phosphorus into forms that plants can readily absorb. This processing yields concentrated phosphate fertilizers used in commercial agriculture.

46. Common phosphate fertilizers products include Diammonium phosphate, Monoammonium phosphate, and Triple superphosphate. These fertilizers are generally manufactured as dry granules that can be transported in bulk and applied directly to fields or blended with other nutrients in compound fertilizers.

***Potash Fertilizers***

47. Potash fertilizers supply potassium, a primary plant nutrient required for healthy crop growth. Potassium helps regulate water movement within plant tissues, activates enzymes involved in metabolism, and supports plant tolerance to environmental stresses such as drought or disease. Potassium contributes to better crop quality and resilience.

48. Potash fertilizers are produced from naturally occurring potash ores formed from ancient, evaporated seas. These mineral deposits are mined or extracted from brines and then processed to separate potassium-bearing compounds suitable for agricultural use. The resulting products contain potassium in forms that plants can absorb as potassium ions.

49. The most widely used potash fertilizer is Potassium chloride, while Potassium sulfate is also used, particularly for crops that are sensitive to chloride. Potash fertilizers are typically sold as crystalline or granular solids that can be applied directly to fields or blended with other nutrients in compound fertilizers.

**II. The NPK Fertilizer Market**

50. American farms cultivate over 220 million acres of cropland, driving an unrelenting demand for NPK Fertilizers. In 2024, the U.S. NPK Fertilizer market was estimated to be valued at almost $30 billion.

51. NPK Fertilizers are favored over other fertilizers because they supply the three macronutrients that crops need in the largest amounts, are highly concentrated, predictable, and fast-acting, allowing farmers to efficiently meet crop nutrient requirements. Unlike organic fertilizers, NPK

Fertilizers provide precise nutrient content, are easy to store and transport, release nutrients more quickly into the soil, and are adaptable to most major crops and soil types, making them the primary choice for high-yield, modern agriculture.

52. The fertilizer industry in the United States has long been characterized by significant consolidation. The NPK Fertilizer industry experienced a drastic consolidation starting in the 1980s. As a result, today each of the major nutrient industries is dominated by a single corporation: Mosaic reigns over the American phosphate market, CF Industries commands the nitrogen sector, and Nutrien has taken charge of the North American potash market as the leading member along with Mosaic. The number of firms in the market has reduced from 46 to 13 since the 1980s, with Defendants now controlling a substantial portion of the market.

### III. Government Investigation into Price-Fixing in the Fertilizer Industry

53. On October 28, 2025, the President of the Iowa Corn Growers Association ("ICGA"), Mark Mueller, addressed a U.S. Senate Committee Hearing on Competition Issues in the Seed & Fertilizer Industries, and reported that "the massive increase in the cost of fertilizer is crushing corn growers in Iowa, and they aren't alone. Growers across the country are facing an impossible decision: buy fertilizer or stay solvent." Mueller attributed high fertilizer prices to two decades of unchecked consolidation in the U.S. fertilizer industry, with only a few major companies controlling each market segment.

54. According to Mueller, the effects of this market concentration had led to fertilizer costs that far outpaced the price farmers received for their corn. For example, the amount of corn sales required to purchase one unit of monoammonium phosphate (a fertilizer that combines phosphorous and nitrogen) had increased from an average of 136 bushels over the last five years to 230 bushels today, increasing the economic pressure on farmers, as fertilizer prices escalate while crop revenues remain comparatively stagnant.

55. In December 2025, President Trump issued an Executive Order directing the U.S. Attorney

General and the Chairman of the Federal Trade Commission to each establish a Food Supply Chain Security Task Force within their respective agencies to aggressively investigate price-fixing and anti-competitive practices across the food sector.

56. On January 21, 2026, United States Department of Agriculture Deputy Secretary Stephen Vaden held a videotaped conversation with the National Agricultural Law Center, in which he attributed high fertilizer prices to anticipative conduct, telling the audience that:

> Mosaic and Nutrien[] have a joint venture in Canada where they openly, their word[,] work together, my word, collude to control prices up there. That would be such a clear violation of the antitrust laws of the United States. They don't bring that joint venture officially down here in the United States. They didn't bring that joint venture officially down here in the United States, but what they've been able to manage to do through other means is achieving the same result, constraining supply and driving up the price that farmers pay.

57. In February 2026, both the ICGA and the Texas Corn Producers Association sent separate letters to U.S. Attorney General Pam Bondi seeking information about what the U.S. Department of Justice ("DOJ") is doing to pursue antitrust actions against the fertilizer industry. As reported by Progressive Farmer, the letters reflect farmers' growing frustrations over lower crop returns while fertilizer prices continue to remain high.

58. On March 4, 2026, Bloomberg reported that the DOJ Antitrust Division had opened a formal antitrust investigation into the pricing practices of major NPK Fertilizer producers to determine whether they colluded or coordinated to raise nitrogen, phosphate and potash fertilizer prices. Bloomberg further reported that the investigation is looking at CF Industries, Koch Inc., Mosaic, Nutrien, and Yara International—the dominant suppliers of fertilizer products in the United States. Sources told reporters the government inquiry is examining whether coordinated pricing or supply decisions crossed the line into civil or criminal antitrust violations.

59. The scrutiny comes after the U.S. fertilizer industry underwent dramatic consolidation over four decades. The number of nitrogen fertilizer producers declined from 46 to 13 between 1984 and 2008,

a reduction of 72%, according to USDA data. Today, four firms control 75% of the nitrogen fertilizer market domestically, while two firms control nearly 100% of the U.S. potash market, according to University of Waterloo research. The industry's pricing power became particularly evident in 2021, when fertilizer costs surged dramatically. Prices U.S. farmers paid for fertilizers increased over 60%, with nitrogen fertilizer prices jumping 95% and potash prices rising over 70%, according to USDA figures. The increases added an estimated $128,000 in costs per farm for feed grain operations in 2022.

Market concentration measures show exceptionally high levels across all fertilizer types. The Herfindahl-Hirschman Index (HHI) for the U.S. market stands at 2,382 for nitrogen, 4,553 for phosphate, and 3,455 for potash, according to Texas A&M AFPC research. Figures above 2,500 are generally considered highly concentrated. Historical data suggests fertilizer cartels have been particularly harmful to consumers. Research from the American Antitrust Institute found that the median overcharge by hard-core fertilizer cartel members was almost 41%, above the 30% overcharge for all industries from 1902-2010.

## IV. Prices for NPK Fertilizers Rose Precipitously During the Class Period Despite Lower Input Prices and Lower Demand

60. Before the start of the conspiracy, NPK Fertilizer price increases were typically transitory, and market forces corrected pricing (consistent with a competitive market).

61. NPK Fertilizer prices rose materially during the Class Period as a result of Defendants' conduct. This was contrary to pricing patterns before the Class Period.

62. These increases cannot be explained by input costs.

## V. The Structure and Characteristics of the Market for NPK Fertilizers Support the Existence of a Conspiracy

63. Economic literature makes clear that structural market factors can be important in assessing whether conspiratorial conduct in violation of the antitrust laws has occurred. Collusion is more likely to occur when industry conditions are already favorable to collusion.

64. ***Concentration of supply side***. Defendants are among the largest producers of NPK

Fertilizers sold in the United States and together control over 80% of the North American nitrogen fertilizer market and over 90% of the North American phosphate and potash markets. Because the manufacture of NPK Fertilizers is highly concentrated, with Defendants controlling the vast majority of production, the NPK Fertilizer market is highly susceptible to collusion.

65. ***Standardization***. NPK Fertilizers are standardized because their nutrients are basic chemical components traded as commodities and used interchangeably, regardless of the specific source. This standardization also makes it easier for competing firms to coordinate on a common price structure.

66. ***Opportunities to collude at trade association meetings***. Collusion also may be facilitated by trade associations. Here, Defendants have had multiple opportunities to collude through trade associations to which they belonged and served as board members. For example, all six Defendants are active members of the International Fertilizer Association ("IFA"), a global fertilizer association, headquartered in Paris, France. Bruce Bohn (CF Industries), Bruce Bodine (The Mosaic Company), Kenneth Sietz (Nutrien), and Svein Tore Holsether (Yara International ASA), are also members of the IFA's Board. IFA sponsors a number of recurring in-person trade events including the IFA Annual Conference and the Cultivating Tomorrow Conference.

67. CF Industries, Inc., Koch Fertilizer, LLC, The Mosaic Company, Nutrien, and Yara North America, Inc. are all members and Board members of The Fertilizer Institute ("TFI"), a national fertilizer industry organization headquartered in Arlington, Virginia. In addition to offering members-only "market volatility information and resources," TFI also sponsors trade events, including an Annual Business Conference, Agronomy Conference and Expo, World Fertilizer Conference, and Market & Logistics Conference.

68. All six Defendants are members of Fertilizer Canada ("FC"), a Canadian fertilizer industry organization headquartered in Ottawa, Ontario. CF Industries, Inc., Koch Fertilizer Canada, ULC, The Mosaic Company, Nutrien, and Yara North America, Inc. are members of the Board of FC. FC represents

producers, manufacturers, wholesale and retail distributors of nitrogen, phosphate, potash and sulfur fertilizers.

69. Nutrien Ltd., The Mosaic Company, and Koch Sulfur Products Company, L.L.C., are all members and Board members of The Sulfur Institute ("TSI"), a global association for sulfur and sulfuric acid professionals, based in Washington, D.C. TSI sponsors a number of in-person trade events each year, such as the Sulphur World Symposium and its annual Executive Committee Meeting.

70. Both David Bilby (CF Industries) and Shawn McGreevy (Koch Fertilizer LLC), are Board members of the Fertilizer Industry Round Table ("FIRT"), a fertilizer trade group. Gary Vogen (Yara North America, Inc.), previously served as a Board member of FIRT. FIRT hosts an annual meeting, in partnership with TFI.

71. Both Koch Agronomic Services, LLC and The Mosaic Company are members of the Agricultural Retail Association ("ARA"), an industry trade group based in Arlington, Virginia. Additionally, Nathan Packer (Nutrien AG Solutions) and Bob Ness (The Mosaic Company) are members of the Board of ARA. ARA hosts a number of recurring in-person events, including the Annual ARA Conference and Expo, in addition to semi-annual in-person meetings of ARA committees.

72. ***High barriers to entry***: There are also high barriers to becoming a manufacturer of NPK Fertilizers. A large capital investment is required to enter the industry, as companies wishing to enter must purchase machines and operating space to manufacture NPK Fertilizers. The importance of research and development in the industry also may deter new entrants.

73. Potential entrants to the industry also must make a significant financial investment to acquire, maintain and update production facilities and equipment. Larger players have an advantage because they are able to build or acquire multiple manufacturing facilities, discouraging others from entering.

74. Thus, the start-up capital necessary to compete with today's NPK Fertilizer manufacturers would be substantial. NPK Fertilizer manufacturers have significant economies of scale, utilizing large and expensive production facilities. Barries to entry in NPK Fertilizer manufacturing both prevent new competitors from entering the market and make the market susceptible to collusion.

75. ***Inelastic demand***. Demand for NPK Fertilizers is inelastic. Industries with inelastic demand, such as the NPK Fertilizers manufacturing industry, are more susceptible to cartel formation and behavior than industries with elastic demand.

76. A lack of substitute goods may be characteristic of inelastic demand. Although there are other fertilizers, NPK Fertilizers cannot be interchanged freely with other goods because they provide precise, balanced nutrients, rapid soil availability, and broad crop adaptability, making them distinct from other fertilizers. Customers do not view NPK Fertilizers as interchangeable with other fertilizers.

77. ***Unconcentrated demand side***. The unconcentrated nature of the demand side of the NPK Fertilizers market and lack of buyer power sufficient to stimulate competition also makes this market susceptible to collusion. Such a large number of buyers, each of whom forms a small share of the total marketplace, means there is less incentive for Defendants to cheat on collusive pricing arrangements, since each potential sale is small, while the risk of disrupting the collusive pricing agreement carries large penalties.

78. ***History of antitrust violations***. Finally, the NPK Fertilizers industry has a history of antitrust scrutiny. In 2008, U.S. purchasers filed antitrust lawsuits alleging that major producers-including companies such as Mosaic, PotashCorp, and Agrium-coordinated production and sales to keep potash artificially high. Plaintiffs alleged producers shared market information, allocated volumes, and restricted output as part of a tight-knit global cartel. Several companies later settled private antitrust claims, with settlements around $43.75 million each from firms such as Mosaic and PotashCorp (without admitting wrongdoing).

## VI. Antitrust Impact and Damages to the Plaintiff and the Class

79. To implement their price-fixing conspiracy, beginning at least as early as January 1, 2020, the exact date being unknown to Plaintiff at this time, Defendants conspired to artificially inflate the price of NPK Fertilizers.

80. Defendants' unlawful agreement caused indirect purchasers of NPK Fertilizers in the United States and its territories, including Plaintiff and the Class, to pay supracompetitive prices for NPK Fertilizers sold by Defendants in the United States and its territories from the period beginning no later than January 1, 2020 and running through the date on which the Class is certified (the "Class Period"), in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

81. Due to Defendants' anticompetitive conduct: (1) competition in the NPK Fertilizers market has been reduced or eliminated, (2) prices for NPK Fertilizers have been maintained at supracompetitive levels, and (3) United States purchasers of NPK Fertilizers have been deprived of the benefit of price competition.

82. Due to Defendants' anticompetitive conduct, Plaintiff and Class members paid more for NPK Fertilizers than they otherwise would have and thus suffered antitrust injury and damages. The overcharges paid by Plaintiff and Class members for NPK Fertilizers constitute antitrust injury and harm to competition.

## CLASS ACTION ALLEGATIONS

83. Plaintiff brings this action on behalf of himself and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of the following class (the "Class"):

> All persons and entities in the United States and its territories who purchased NPK Fertilizers directly from any of the Defendants of their subsidiaries or affiliates during the period beginning no later than January 1, 2021 until the date on which a class is certified in this case.
>
> Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, and the Court

and its staff.

84. ***Numerosity***. While Plaintiff does not know the exact number of Class members, the class is sufficiently large such that joinder is impracticable given Defendants' substantial nationwide presence.

85. ***Commonality***. Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all Class members, thereby making relief with respect to the Class as a whole appropriate. Such questions of law and fact common to the Class include, but are not limited to:

a. Whether Defendants engaged in a combination and conspiracy to fix, raise, maintain or stabilize the prices of NPK Fertilizers in the United States and its territories.

b. The identity of the participants in the alleged conspiracy;

c. The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

d. Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

e. Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and Class members;

f. The effect of the alleged conspiracy on the price of NPK Fertilizers during the Class Period;

g. Whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and Class members;

h. The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

i. The appropriate class-wide measure of damages.

86. ***Typicality***. Plaintiff's claims are typical of the claims of the Class members, and Plaintiff and undersigned counsel will fairly and adequately protect the interests of the Class. Plaintiff and all Class members are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for fertilizer from Defendants.

87. ***Adequacy***. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other Class members. Plaintiff's interests are coincident with, and not antagonistic to, those of the other Class members. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

88. ***Predominance***. The questions of law and fact common to the Class members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

89. ***Superiority***. A class action is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## I. Interstate Trade and Commerce

90. Billions of dollars of transactions in NPK Fertilizers are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce

91. Defendants' conspiracy had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for NPK Fertilizers in the United States and its

territories.

92. Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of the NPK Fertilizers sold in the United States, the prices of NPK Fertilizers would have been determined by a competitive, efficient market.

## II. Antitrust Injury

93. Defendants' antitrust conspiracy had the following effects, among others:

a. Price competition has been restrained or eliminated with respect to the pricing of NPK Fertilizers;

b. The prices of NPK Fertilizers have been fixed, raised, maintained, or stabilized at artificially inflated levels;

c. Purchasers of NPK Fertilizers have been deprived of the benefits of free and open competition; and

d. Purchasers of NPK Fertilizers paid artificially inflated prices.

94. The purpose of the conspiratorial and unlawful conduct of Defendants and their agreement was to fix, raise, stabilize, and/or maintain the price of NPK Fertilizers.

95. The precise amount of the overcharge impacting the prices of NPK Fertilizers paid by Plaintiff and the Class can be measured and quantified using well-accepted models. Due to Defendants' price-fixing conspiracy, Plaintiff and the Class have sustained injury to their businesses or property by paying higher prices for NPK Fertilizers than they would have paid in the absence of Defendants' illegal conduct and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## Claims

### Count I: Price-Fixing in Violation of the Sherman Act, 15 U.S.C. §§ 1, 3

96. Plaintiff realleges the allegations set forth above as if set forth fully herein.

97. Beginning as early as January 1, 2020, Defendants entered into and engaged in a contract, combination, or conspiracy with regard to fertilizer in an unreasonable restraint of trade in violation of Sections 1 of the Sherman Act (15 U.S.C. §§ 1, 3).

98. The contract, combination, or conspiracy consisted of an agreement among Defendants to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for NPK Fertilizers in the United States and its territories.

99. In formulating and effectuating this conspiracy, Defendants did those things that they combined and conspired to do, including the following:

a. Exchanging competitively sensitive information among themselves, with the aim to fix, raise, stabilize, or maintain prices of NPK Fertilizers sold in the United States and its territories;

b. Participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise fix, raise, stabilize, or maintain prices of NPK Fertilizers, including surcharges on NPK Fertilizers sold in the United States and its territories; and

c. Participating in meetings and conversations among themselves to implement, adhere to, and police the agreements they reached.

100. Defendants engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, stabilize, or maintain prices of fertilizer.

101. Defendants' conspiracy had the following effects, among others:

a. Price competition in the market for NPK Fertilizers have been restrained, suppressed, and/or eliminated;

b. Prices for NPK Fertilizers provided by Defendants have been fixed, raised, stabilized, or maintained at artificially high, non-competitive levels throughout the United States and its territories; and

c. Plaintiff and Class members who purchased NPK Fertilizers have been deprived of the benefits of free and open competition.

102. Plaintiff was also deprived of the benefits of free and open competition. Plaintiff is

threatened with future injury to his businesses and property unless Defendants are enjoined from further unlawful conduct.

103. In addition to actual and treble damages, interest, attorneys' fees, and costs, Plaintiff also seeks equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct the anticompetitive market effects caused by Defendants' unlawful conduct and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future.

## REQUESTED RELIEF

**WHEREFORE**, Plaintiff and the Class respectfully request the following relief:

A. That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal laws set forth above;

B. That the Court award Plaintiff damages, treble damages, interest, punitive damages, and/or restitution in an amount to be determined at trial;

C. That the Court issue appropriate injunctive and other equitable relief against Defendants;

D. That the Court award pre- and post- judgment interest;

E. That the Court award Plaintiff the cost of suit, including reasonably attorneys' fees and expenses, including costs of consulting and testifying experts;

F. That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b) of the Federal Rules of Civil Procedure, that the Plaintiff be named as Class Representative of the Class, that the undersigned be named as Class Counsel, and that the Court direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members; and

G. That the Court award any and all such other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all matters so triable.

Dated: April 15, 2026

/s/ Jon A. Tostrud
Jon A. Tostrud (Bar No.: 0251768)
Anthony M. Carter (Bar No. 39736)
**TOSTRUD LAW GROUP, P.C.**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 278-2600
Facsimile: (310) 278-2640
jtostrud@tostrudlaw.com
acarter@tostrudlaw.com

Erik H. Langeland (Bar No. 2708899)
**ERIK H. LANGELAND, P.C.**
733 Third Avenue, 16th Floor
New York, NY. 10017
Telephone: (212) 354-6270
elangeland@langelandlaw.com

*Attorneys for Plaintiff and the Proposed Class*